UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:02CR308(JCH) |
| | : | |
| v. | : | |
| | : | |
| WAYNE SINCLAIR | : | AUGUST 4, 2005 |

**GOVERNMENT'S MEMORANDUM IN AID
OF POST-*CROSBY* PROCEEDINGS ON REMAND**

The Government respectfully submits this memorandum in response to the Court's Order dated June 15, 2005, inviting written submissions from the parties on whether the Court would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory; and otherwise in aid of proceedings on remand from the United States Court of Appeals for the Second Circuit.

**I.       Procedural History**

On October 29, 2002, a federal grand jury returned a one-count indictment charging the defendant, Wayne Sinclair ("Sinclair") with being found in the United States after having been previously deported, in violation of 8 U.S.C. §§ 1326(a) and 1326(b).  The defendant pleaded not guilty and was tried before a jury on April 1 and 2, 2003.

On April 2, 2003, the jury found beyond a reasonable doubt that Sinclair was unlawfully found in the United States after having been previously deported, in violation of 8 U.S.C. §§1326(a) and 1326(b)(2), as charged in the indictment.

At sentencing on June 23, 2003, the Court carefully considered all of the relevant sentencing factors in this case and sentenced Sinclair principally to 92 months of imprisonment.

On June 27, 2003, the defendant timely filed a notice of appeal.

On December 22, 2004, the United States Court of Appeals for the Second Circuit issued a summary order rejecting the defendant's various claims on appeal, characterizing his challenge to the sufficiency of the evidence as "frivolous," and affirming the defendant's conviction in all respects; but withholding the mandate pending the Supreme Court's then-anticipated decision in Booker and Fanfan.  See United States v. Sinclair, 119 Fed. Appx 304 (2d Cir. 2004).

On May 13, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case, in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

On June 15, 2005, this Court issued an Order inviting simultaneous briefing from the parties on the question whether it would have imposed a non-trivially different sentence in the case if the Sentencing Guidelines had been advisory.  The instant memorandum is the Government's submission in that regard.

## II.     Purpose of *Crosby* Remand

In Booker, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. §3553(b)(1), thus declaring the Guidelines "effectively advisory."  Booker, 125 S. Ct. at 757.  This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction.  The sentence will be subject to appellate review for "reasonableness."  Id. At 765-66.

In Crosby, the Court of Appeals determined that it would remand most pending appeals involving challenges to sentences imposed prior to Booker "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence." Crosby, 397 F.3d at 117. In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, *under the circumstances existing at the time of the original sentence*, if the judge had discharged his or her obligations under the post-Booker/Fanfan regime and counsel had availed themselves of their new opportunities to present relevant considerations." Id. (emphasis added).

This statement of the purpose for Crosby remands makes clear that certain issues are simply irrelevant to this Court's determination whether to re-sentence. Specifically, because this Court must determine whether to re-sentence based on "the circumstances existing at the time of the original sentence," id., arguments relating to post-sentencing factors are irrelevant. In short, the court must determine whether it would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory at the time of the original sentence, and under the circumstances existing at the time of the original sentence.

### III. Factual Background

On December 9, 1997, the defendant, Wayne Leopold Sinclair, was deported from the United States at JFK International Airport, aboard American Airlines Flight #645 to Kingston, Jamaica. In August 2002, the defendant was found back in the United States without permission, when he appeared for a proceeding in Superior Court in Hartford, Connecticut.

### a. The Government's Trial Evidence

During a two-day trial in April 2003, the jury heard the following evidence: On May 17, 1995, an immigration judge ordered the defendant deported to Jamaica. After exhausting appeals to the Board of Immigration Appeals and the Second Circuit, the defendant became available for deportation in late 1997. Accordingly, the Immigration and Naturalization Service ("INS") began to arrange for travel to effect the defendant's deportation.

Specifically, the INS had a travel agency book a flight for the defendant. Documents showed a scheduled flight for Wayne Sinclair on December 9, 1997, aboard American Airlines Flight #645, which had a scheduled departure time of 10:00 a.m. and a scheduled arrival time at Kingston Manley Airport in Jamaica of 3:46 p.m. The documents set forth additional information, including the alien file number for the defendant.

The INS also arranged for an emergency passport for the defendant through the Jamaican Consulate General. Specifically, on December 4, 1997, that office issued an "Emergency Certificate of Travel" for Sinclair, on which he was described as "under deportation." The Emergency Certificate was issued specifically for "Wayne Leopold Sinclair," bore his picture and date of birth, and specifically indicated that it was valid only for the December 9 flight. The jury heard testimony from INS Officer James Brown that the Emergency Certificate was tantamount to a one-way, one-time passport.

In anticipation of his removal, the defendant was taken into custody at the Hartford County Correctional Center ("HCC") on November 13, 1997, and remained there until December 8, 1997, when he was released into the custody of the INS and held overnight for his deportation the following morning.

On the morning of December 9, 1997, INS Officers James Brown and David Ostrobinski picked the defendant up in Hartford and drove him to JFK Airport. At the airport, the officers took the defendant's fingerprint, which appeared on his Warrant of Deportation. The officers escorted the defendant through check-in and all the way to the gate. The officers escorted Sinclair onto the flight, took him to his assigned seat; buckled him in, and thereafter made sure all exits of the plane other than the front exit were secured. Officer Brown testified that all such flights, including Sinclair's flight to Jamaica, were non-stop flights that go directly to their destination.

The officers then stood at the one and only available exit to the plane and ensured that the defendant did not disembark. Prior to the door closing, the officers stepped back into the plane, made "eye contact" with Sinclair to ensure that he was still sitting in his seat, then exited the plane shortly before the door was closed. The officers continued to watch the plane leave for as long as they could maintain visual contact and then confirmed with American Airlines personnel that the flight had, in fact, departed. After confirming that the flight was airborne, both officers then completed the execution of the Warrant of Deportation.

At approximately 3:46 p.m. on that day, Flight #645 arrived as scheduled in Jamaica with Wayne Sinclair on board. Jamaican immigration authorities entered Sinclair's arrival in a logbook they regularly maintain for all deportees who arrive on the island from various countries. A copy of a page from the logbook for the relevant time period, listed an entry on December 9, 1997, at "15:46 hours" aboard "AA645" (American Airlines Flight #645) for a "Wayne Leopold Sinclair." In addition, in response to a question from defense counsel, Officer Brown testified that all people entering Jamaica must complete a Jamaican customs immigration declaration

form, and that he had personally seen, in Jamaica, such a declaration form that had been completed by Sinclair during his flight to Jamaica.

The jury also heard evidence confirming that it was the Wayne Sinclair sitting in the courtroom during the trial who was deported to Jamaica on December 9, 1997. First, the jury heard the eyewitness testimony of the two deportation officers who escorted Sinclair to his deportation flight. Officer Brown identified the defendant in court and testified that he specifically remembered escorting the defendant to JFK Airport. Trooper Ostrobinski testified that, although he could not specifically identify the defendant given the lapse of time and the number of deportations in which he participated, his signature on the Warrant of Deportation meant that the individual in the photograph was the one whom he deported. Trooper Ostrobinski further testified that the individual in the photograph on the Warrant of Deportation resembled the defendant sitting in court on April 1, 2003.

The government also introduced a wealth of documentary evidence relating to the defendant's deportation, which contained specific identifying information for Wayne Leopold Sinclair. Those documents included, among other things, his full name; his date of birth; his social security number; his alien registration number; and his picture.

The government's evidence also included two independent fingerprint analyses of the right index fingerprint that appeared on the December 9, 1997, Warrant of Deportation. Specifically, the results of an FBI fingerprint analysis confirmed that the print on the Warrant of Deportation matched a print for Sinclair already on file. In addition, Gene Redmond, an Identification Technician with the Connecticut State Police Bureau of Identification, testified that the print on the Warrant of Deportation matched a print for Sinclair already on file as well.

Finally, the government's evidence regarding the December 9, 1997, deportation included Government Exhibit 22 -- a warning of rights given to Sinclair on the date of his deportation. The completed form indicated that it was served on Wayne Sinclair on December 9, 1997; that Sinclair signed it on that date; and that Sinclair's signature was witnessed by Officer Brown.

The evidence also showed that, approximately five years later, on August 13, 2002, INS Special Agent Mike Loser received a phone call from the State's Attorney's Office in Hartford, informing him that the defendant was scheduled to appear in Hartford Superior Court on August 19, 2002. Special Agent Loser testified that INS records confirmed that Wayne Leopold Sinclair had been previously deported to Jamaica on December 9, 1997. INS Special Agent Stephen Back testified that he prepared an INS detainer and faxed it to the Connecticut Judicial Marshals so that the defendant would be detained if he showed up for his court appearance.

Connecticut Judicial Marshal Sam Minella testified that, when Sinclair showed up for court on August 19, 2002, and the judge informed him of the INS detainer, Sinclair tried to flee. Specifically, Sinclair pushed a Judicial Marshal out of the way and ran out of the courtroom until Marshal Minella and others were able to restrain him.

Sinclair spent a number of days in custody, after which he was taken into custody and processed by the INS on or about August 30, 2002. The jury heard testimony that, during processing, Sinclair's fingerprints were taken again. The FBI fingerprint analysis and testimony from Gene Redmond established that the fingerprints taken from the defendant in August 2002 also matched those of the defendant.

The jury also heard evidence that a diligent search by both INS Special Agent Mike Loser and Ruth Jones, Chief of the Records Services Branch for the INS, failed to yield any indication

that Wayne Sinclair had received permission to either be back in the United States or to apply for readmission.

### b. The Defendant's Trial Testimony

On April 2, 2003, after a full canvas by the Court on the risks of testifying, the defendant chose to take the stand. The defendant's version of the events stood in stark contrast to the Government's version.

The crux of the defendant's testimony was that he had never been deported; that he had never been put on a plane at all; and that he had been in the United States all along.

With respect to whether he had previously been deported, the defendant claimed that, in November 1997, he was picked up by the INS and held for a week at the Hartford Correctional Center, after which he was simply released, without any further action.

The defendant also testified that he had never before seen the Emergency Certificate of Travel issued for "Wayne Leopold Sinclair" for the December 9, 1997, flight; and claimed that the picture affixed thereon "does not look like me." On December 9, he claimed, "I was at work."

Similarly, Sinclair testified that he had never before seen the Warrant of Deportation dated December 9, 1997, which contained his flight information; his picture; his signature; his right index fingerprint; and the verifying signatures of Officers Brown and Ostrobinski. Sinclair claimed that neither the fingerprint nor the signature on the Warrant of Deportation was his. Sinclair went on to claim that he had not seen any INS officers on December 8 or 9, 1997, and that he was not at JFK Airport on December 9.

Sinclair also claimed that, when he showed up for court on August 19, 2002, and he heard a reference to immigration, he never attempted to flee, but rather "walked" towards the door, at which point a marshal spontaneously tackled him and threw him down. Although not introduced at trial, the defendant then avoided the fact that he had been held in criminal contempt by the judge and detained for ten days before his transfer to INS custody, claiming that, after he apologized to the court, that was the end of the matter.

Sinclair then testified that he had never before seen the advice of rights upon deportation form given to him on December 9, 1997. He claimed that he was not incarcerated at Thanksgiving time in 1997 but rather attended dinner at a relative's house. Indeed, he testified in exquisite detail about, among other things, how he got there, who was there; what he ate for dinner and how long he stayed. Sinclair also claimed that he was not incarcerated, but rather, working, on December 8, 1997; that he was living with his girlfriend, Pauline, at the time; and that he was not, and had never been, deported from the United States. He vehemently denied that his girlfriend, Pauline Davis, came to visit him at the Hartford Correctional Center on December 1, 1997. The defendant went so far as to deny that he was subject to the Order of Deportation.

### c. The Government's Rebuttal Case

During its rebuttal case, the Government elicited the testimony of State of Connecticut Department of Corrections ("DOC") Records Custodian Lucien Carrier, and introduced several DOC documents establishing that, contrary to the defendant's testimony, the defendant had, in fact, been in custody at Hartford Correctional Center for the entire period of time from November 13, 1997, until December 8, 1997, when he was released into INS custody for his deportation the following day. In addition, contrary to the defendant's testimony that he was not in custody at

9

HCC on December 1, 1997, and had not received a visit by his girlfriend on that date, the Government introduced a DOC list of visitors for the defendant, which included a December 1, 1997, visit at HCC by Pauline Davis -- who Sinclair had admitted was his girlfriend at the time.

As noted above, on April 2, 2003, the jury returned its guilty verdict, convicting Sinclair of unlawfully being found in the United States after having been previously deported, in violation of 8 U.S.C. §§1326(a) and 1326(b)(2).

## IV.   The Sentencing Proceeding

On June 23, 2003, the district court sentenced Sinclair to 92 months' imprisonment, the bottom of the applicable Guideline range.

The defendant's Guidelines were calculated in the Pre-Sentence Report ("PSR"), which the district court adopted as its findings, see Sentencing Transcript dated June 23, 2003 at 5-13, as follows. The court determined the base offense level to be 8, pursuant to U.S.S.G. §2L1.2(a) for re-entry into the United States of a removed alien. See Sentencing Transcript, 6/23/2003 at 5. The Court then added 16 additional levels pursuant to 2L1.2(b)(1)(A) because the defendant's unlawful reentry followed a conviction for a drug trafficking offense for which the sentence imposed exceeded 13 months. Id.

The court also heard argument whether the defendant's testimony should serve as a basis for enhancing the defendant's sentence for obstruction of justice. During argument, counsel for the defendant recognized that the jury must have concluded that the defendant lied, and conceded that such a finding was made by the jury, beyond a reasonable doubt:

THE COURT:      The jury had to find that he had been deported.

MR. MOORE:      That is true.

> THE COURT:        The only evidence offered by the government was he was deported on December 9th, 1997.
>
> MR. MOORE:        Yes, your Honor.
>
> THE COURT:        The jury had to believe the government's proof in that respect in order to convict him, correct?
>
> MR. MOORE:        Correct.
>
> THE COURT:        They offered no other proof of when he left the United States.
>
> MR. MOORE:        Which meant they had to believe that [the defendant] was not telling the truth.
>
> THE COURT:        Correct.
>
> MR. MOORE:        They only found that beyond a reasonable doubt . . . .

See Sentencing Transcript, 6/23/2003 at 7. In ruling that the defendant had committed perjury and obstructed justice, the Court also noted the jury finding and stated, in pertinent part:

> The defendant testified at trial in great detail about the fact that he was not deported, ever, let alone on that date. Obviously, the jury rejected the defendant's testimony in finding him guilty. The Court today makes its own independent assessment of the defendant's testimony and finds that his testimony was *incredible*.
>
> The Court finds that he did indeed lie concerning the issue of his deportation in 1997, and that his testimony, which was rejected by the jury, was not a result of confusion, mistake or faulty memory. It is *inconceivable* to this Court that one would be placed against his will upon an airplane, even five-and-a-half years ago, and not be able to remember that fact or be mistaken about it, particularly to the extent that the defendant testified he was never deported. It wasn't an issue of a mistake about the date; but that he had never been deported.
>
> Therefore the Court finds that the defendant does qualify for the adjustment for obstruction of justice under 3C1.1.

See Sentencing Transcript, 6/23/2003 at 11 (emphasis added); see also id. at 64-65 ("I should add additionally that there was evidence before the jury that showed that Mr. Sinclair was in the

custody of the state authorities pursuant to the INS detainer in December, in advance of his removal from the United States, which the defendant denied."). The Court therefore added an additional two points to the defendant's offense level, resulting in a total adjusted offense level of 26. Id. at 11.

With respect to the defendant's criminal history, the Court found the defendant to have 8 criminal history points, resulting in a Criminal History Category of IV. Id. at 13. In so doing, the Court, having reviewed the relevant case law, overruled the defendant's objection that he should not have received a point for a certain breach of peace conviction for which he received a conditional discharge. Id. at 11-13.

The Court then determined that a total adjusted offense level of 26, with a criminal history category of IV, resulted in an applicable Guideline range of 92 to 115 months. Id. at 13.

The Court then considered argument on various departure grounds advanced by counsel for the defendant, as well as those urged upon the Court by the defendant himself.[1] During the course of that argument, and at other times during the sentencing proceeding, the defendant himself addressed the court, in addition to the arguments and statements made by counsel. The Court then labored to carefully and thorough review, and ultimately reject, the more than twenty-

---

[1] On or about June 12, 2003, counsel for the defendant filed a memorandum entitled "Additional Objections to Pre-Sentence Report." That filing included a one-page cover memorandum, which stated: "Counsel for the Defendant has recently received the attached redacted communication from Mr. Sinclair about additional factors that should be considered by the court before imposing sentence. These factors all relate to a downward departure under U.S.S.G. 5K2.0." Attached to the memorandum was what appeared to be an attorney-client communication – specifically, a letter from the defendant to his counsel, portions of which had been redacted. The letter identified over twenty-five potential departure grounds by name and simply listed certain case citations underneath. The claims, however, had not been explained or developed in any detail.

five grounds for departure advanced by the defendant.  <u>See</u> Sentencing Transcript, 6/23/2003 at 14-51; and <u>e.g.</u>, at 34-38 (denying departures argued by counsel for the defendant); at 38 ("Turning now to the long list of bases for departure contained in the attachment to the 'additional objections to presentence report' . . . the Court will address them in order."); and at 51 ("The Court, therefore, declines to depart on any of the grounds raised by the defendant.").

At that point in the proceeding, the parties and the district court realized that the defendant's motion for judgment of acquittal was still pending.  Accordingly, in an oral ruling from the bench, the district court, noting that the basis for the defendant's motion was a claim of insufficiency of the evidence, denied the defendant's motion, noting that "the evidence was quite strong" <u>See</u> Sentencing Transcript, 6/23/2003 at 53.  After a detailed review of the evidence, the court concluded that the "jury had before it more than sufficient evidence to reasonably conclude that this defendant had indeed been previously deported from the United States."  <u>See</u> Sentencing Transcript, 6/23/2003 at 60-65.  When the defendant himself then began to argue with the ruling, <u>see</u> Sentencing Transcript, 6/23/2003 at 65, the court responded:

> Sir, I'm not going to reargue the trial.  All of that was developed at trial.  There was argument made to the jury about what to believe and not believe.  As I've indicated, the jury can accept some testimony, reject other parts of the same person's testimony, the same portion of evidence.
>
> My conclusion is that there was more than sufficient evidence before the jury, which the jury, if it credited it, could reasonably have concluded that you, in fact, were deported, removed from the United States, on December 9th, 1997, taken from custody in a state facility in Hartford, Connecticut that morning and placed on a plane in New York bound for Jamaica.

<u>See</u> Sentencing Transcript, 6/23/2003 at 66.

The court then heard from counsel with respect to the appropriate sentence to be imposed in this case. Counsel for the government urged the court to sentence at the higher end of the range, in light of, among other things, a prior domestic violence conviction that included punching a woman; kicking her in the stomach; pinning her down; and covering her mouth with one hand while placing the other hand on her throat, until the two were interrupted by the woman's children, allowing her to ultimately escape. See Sentencing Transcript, 6/23/2003 at 67-70; see also PSR ¶¶ 44-45. The government noted that the family services division, when evaluating the circumstances of that event had noted that "Mr. Sinclair regularly insists on his innocence, feigns confusion over court orders and blames others for the circumstances in which he finds himself." See Sentencing Transcript, 6/23/2003 at 68; PSR ¶45.

The court ultimately imposed a sentence of 92 months, the bottom of the applicable Guideline range. See Sentencing Transcript, 6/23/2003 at 72.

## V.    Discussion

There is simply no compelling reason for the District Court to hold a re-sentencing in this case because the Court carefully considered all of the relevant sentencing considerations at the time of the original sentencing – and, as set forth below, clearly and unequivovally expressed its view as to why its sentence of 92 months was appropriate for the defendant.

Sentencing in the post-Booker regime, as explained in Crosby, now involves two analytic stages: first, a determination of the applicable Guidelines range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in 18 U.S.C. §3553(a), there is any reason to impose a non-Guidelines sentence. Crosby, 397 F.3d at 113. As set forth above, a review of the record in this case including the sentencing transcript

and the PSR, demonstrates that the Court already engaged in such an analysis.

During the course of the sentencing proceedings the Court carefully considered the Guidelines issues argued by the defendant as well as the defendant's numerous arguments for downward departure. Moreover, the Court's comments during the proceeding very clearly indicated that it would not have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory – indeed, the Court indicated that it came very close to sentencing the defendant to 115 months – the *top* of the applicable Guideline range, as urged by the Government. Although noting that the 92 month length of the sentence did not require the Court to state its reasons for the sentence, the Court stated:

> I'm going to state them anyway. I'm not quite sure how to put this, Mr. Sinclair, but I really do think you have a problem with accepting responsibility. By saying that, I do not mean to suggest that you do not have the absolute right to deny your guilt for the crime that you are charged and tried and convicted on here. You have that absolute right. You have the right to persist in an insistence that you are innocent.
>
> And so I would never use that as a ground to either depart upward or to sentence you higher up in the guideline range. I make the statement, however, because I think that the officer in the state system back in connection with one of your convictions very correctly commented that you have difficulty accepting, how is it that she put it, you insist on your innocence, feign confusion over court orders and blame the victim for the incidences.
>
> Putting aside your guilt or innocence, your claimed innocence on this offense. During your testimony, you also denied that there was any consequence to your attempting to flee the courtroom when someone identified you as the person on whom an INS warrant was wanted. The facts suggest that the opposite occurred, that someone did attempt to detain you, that you fought with them and that you were, in fact, punished for that contempt.
>
> There are other ways, aside from the actual event that was the subject of the proof in this case, of your being removed on December 9th, that the testimony was entirely contradicted.

> Your denial that you were in custody in a state facility when the record book shows that you were visited by a person whom I don't believe you contested was a girlfriend at the time. It would have to be an extraordinary confluence of events that would call for her visiting that facility in or about the beginning of December 1997, and for you not to be the person she was visiting. It may happen, it might have happened, Mr. Sinclair, but I really don't believe that it did. I believe it was you that she visited.
>
> Your denial that you were subject to an order of deportation, while you may contest it, while you may think it was improperly entered, while you may disagree with Judge Shapiro, you were subject to an order of deportation . . . .
>
> *I have a feeling that there's not anything that I can say today that would have any effect upon you, Mr. Sinclair, so I'm not going to bother to say anything more.*
>
> *I thought long and hard to sentence you to 115 months, at the top of the range. Attorney Reynolds is absolutely correct in the arguments he made to me . . . and I probably should have put you to a sentence of 115 months and I may very well regret that I didn't.*
>
> *But my feeling is that the sentence of 92 months is sufficient to serve the purposes of sentencing under the guidelines and under the statute*, that you will be subject to deportation at some point at the end of those 92 months and I guess if you figure out a way to get back into the country again, you will have violated my supervised release and I'll sentence you to the remaining two years that I could have had available to me today, at that time.

See Sentencing Transcript, 6/23/2003 at 73-75 (emphasis added).

In short, the Court made it abundantly clear, in no uncertain terms, that it fully intended to sentence the defendant to 92 months – and indeed, that it seriously considered sentencing him to 115 months. Moreover, at the original sentencing, the Court clearly and expressly met both analytic stages of sentencing in the now post-Booker regime, and as explained in Crosby: first, it determined the applicable Guidelines range (including any departures); and second, it indicated whether in light of the Guidelines and the other factors listed in 18 U.S.C. §3553(a), there was any reason to impose a non-Guidelines sentence through its very clear statements why it believed that its sentence at the bottom of the applicable Guideline range was entirely appropriate – under both the Guidelines and 18 U.S.C. §3553(a). Accordingly, on this record, it cannot seriously be

16

contended that the Court would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory.

## VI.     Conclusion

For the foregoing reasons, in conformity with the procedures outlined in Crosby, this Court should indicate, for the record, that after consideration of the defendant's Guidelines range and all of the factors listed in 18 U.S.C. § 3553(a), the defendant should not be re-sentenced.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT19105
UNITED STATES ATTORNEY'S OFFICE
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3000
(203) 579-5575 (fax)
Stephen.Reynolds@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing "Crosby memo" was forwarded by mail on August 4, 2005 to:

>Jeremiah Donovan, Esq.
>P. O. Box 554
>Old Saybrook, Connecticut 06475

This is also to certify that a courtesy copy of the foregoing "Crosby memo" was hand-delivered on August 4, 2005 to:

>The Hon. Janet C. Hall
>United States District Judge
>United States Courthouse
>915 Lafayette Boulevard
>Bridgeport, Connecticut 06604
>
>Jacqueline Carroll
>United States Probation Officer
>U.S. Probation Office
>915 Lafayette Boulevard
>Bridgeport, Connecticut 06604

>_____
>STEPHEN B. REYNOLDS
>ASSISTANT UNITED STATES ATTORNEY