UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : NO. 3:02 CR 308 (JCH) |
| | : |
| WAYNE SINCLAIR, | : |
|       Defendant. | : August 4, 2005 |

## **DEFENDANT'S RESENTENCING MEMORANDUM**

*Introduction*: In <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), the Supreme Court declared unconstitutional and excised from the federal sentencing statute, 18 U.S.C. § 3553, the mandatory sentencing provision set forth in subsection (b)(1) of the stature.  In <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Court of Appeals for the Second Circuit provided guidance to the district courts as to how to apply <u>Booker</u> in future sentencings: the Court is to calculate the guideline range, which is now advisory, and then make a determination as to whether, in light of the sentencing objectives set forth in the federal sentencing statute, the sentence recommended by the Sentencing Guidelines is reasonable.  If it is not, the sentencing court is free to impose that sentence that it believes is reasonable under the circumstances.

      This case is on remand from the Court of Appeals to allow the Court to reconsider, in light of <u>Booker</u> and <u>Crosby</u>, its sentence of 92 months, imposed at a time when this Court (and every other district court in the land) believed that sentencing in accordance with the federal sentencing guidelines was mandatory.  In this case, the <u>Booker</u> and <u>Crosby</u> decisions provide the Court with the authority to impose a sentence that is both just and compassionate, a sentence that better advances the objectives of the sentencing statute than the Sentencing Guidelines do.

      As Judge Newman wrote in <u>Crosby</u>, "[p]rior to <u>Booker/Fanfan</u>, the section 3553(a) requirement that the sentencing judge 'consider' all of the factors enumerated in that section had

2

an uncertain import because subsection 3553(b)(1) required judges to select a sentence within the applicable Guidelines range unless the statutory standard for a departure was met. Now, with the mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to 'consider' numerous factors acquires renewed significance." While the Guidelines have not been discarded, the Guidelines are now one factor, among the other factors set forth in § 3553(a), that a sentencing court must consider.

Among the factors that the sentencing statute instructs the Court to consider are:

***(1) the nature and circumstances of the offense and the history and characteristics of the defendant.***

*(a) the nature and circumstances of the offense:* Under the sentencing guidelines, the seriousness of the offense is measured quantitatively, by adding points assigned to a series of objective factors. <u>Booker</u> and <u>Crosby</u>, however, allow the fulfillment of Bob Dylan's "wish that for just one time you[r Honor] could stand inside [the defendant's] shoes,"[1] and when one does, the nature and circumstances of the offense look very different from the guideline computations.

At the age of 23, Mr. Sinclair was convicted of a federal drug offense. Unfortunately, there are no second acts in America, at least for aliens. Unlike a United States citizen, Mr. Sinclair was unable to serve his sentence and begin life anew. Changes in the law after his conviction resulted in an order that he be deported. At the time of the order, everyone he loved in the world was in Connecticut: he had no father; the mother he adored was in Hartford; the woman he loved tumultuously and the children he had fathered with her were here as well. Mr. Sinclair, who many letter writers describe as ambitious and hardworking, faced in Jamaica an

---

[1] A paraphrase of a line in "Positively Fourth Street."

economy in disarray, a political system in tatters, and a level of violence that would make even a Hartford resident shudder. As Hesiod wrote, "Never dare to taunt a man with deadly poverty, which eats out the heart."[2]

While the sentencing guidelines demand a harsh sentence of those convicted of drug offenses who return to the United States unlawfully, the guidelines surely envision professional drug dealers who are convicted, deported, and return to renew their drug dealing. Mr. Sinclair, however, has no convictions since December 9, 1997, the date the INS officers testified that he was deported.

Standing in the defendant's shoes, we can understand how Mr. Sinclair's yearning to be with those he loves and his ambition to do something with his life might cause him to be found in the United States unlawfully and why he has fought so vigorously to avoid a conviction that would separate them again. Viewing the nature and circumstances of this re-entry while standing in Mr. Sinclair's shoes, a 92-month sentence seems harsh indeed.

***(b) the history and characteristics of the defendant:*** While the Guidelines severely limit the Court's consideration of the history and characteristics of a defendant, see, e.g., U.S.S.G. § 5H1.12 (limiting court's consideration of disadvantaged upbringing), the statute instructs the Court to take the defendant's history and character into consideration.

As the presentence report indicates, Mr. Sinclair is a man who was raised without paternal guidance. His father deserted his mother when he was one year old and he has had no contact with his father since. He adores his mother and is good to her. She writes of his care and concern when she was diagnosed with type 2 diabetes: Mr. Sinclair brought her to appointments, made sure that her prescriptions were filled and taken properly, and clipped articles about the

---

[2] *Works and Days*, 1.717 (c. 800 B.C.)

disease and its treatment from newspapers and magazines.

He is not a trouble-maker. He has served his prison time in a dignified and resigned manner. At his initial sentencing, the defense presented a letter from Wyatt indicating that his time there was incident-free and that during his pretrial incarceration he had successfully completed an interpersonal violence program.

Since arriving in the United States, he has worked hard at a variety of employments. While the presentence report indicates that when he first arrived in the United States as a recent high-school graduate, he was often absent from his employment, his work habits became steadier as he grew older.

Elaine Schaefer met him when he came to work at her law firm as a temporary accounts receivable clerk. Although two earlier temps had left in frustration, he quickly caught on to the job and made it his own. Micheline Stewart, another co-worker at the firm, confirms that Mr. Sinclair was "a quick learner and very organized." Mr. Sinclair's mother writes that he sometimes worked two and even three jobs. Stacy Sims confirms this, and writes that "[h]e was exceptionally dedicated to his employer and would go in to work even when not feeling well."

While the Court rejected the argument that extraordinary family responsibilities provide a ground for a downward departure, it is a factor that the Court can consider in weighing the history and characteristics of Mr. Sinclair.

Elaine Schaefer writes movingly of how Mr. Sinclair treated her daughters as his own. "Wayne treated my daughters as if they were his own which is very important to me because one of my daughters has cerebral palsy with developmental delays. Wayne is very gentle and attentive to my daughter, Megan, and she is quite taken with him. He also taught my eldest daughter, Lisa, how to drive and that takes a lot of patience especially with my daughter who can

5

be very difficult at times." She describes Mr. Sinclair's attentiveness to their son Jordan during prison visits, and her hope that as her son's intellect and consciousnees grow, he could get to know his father as a dad who happens to live in Jamaica rather than as my old man in federal prison.

Ms. Schaefer's mother, Lucienne Marchand, confirms that Mr. Sinclair "treats my grand daughter Megan very well . . . . It is important to have someone around Megan who is so good to her." Ms. Schaefer's sister, Danielle Tillman, and her daughter Lisa, also write to confirm the details of Ms. Schaefer's moving letter.

Ms. Schaefer's friend, Darlene Koniarz, portrays an image of the defendant quite different from that of his criminal history category. "I saw," she writes, "a man who completed schooling, who is open and warm to other people and has a charisma to get a young special needs child to warm up to him. I saw him step in and help my friend's older daughter learn to drive. I saw him make my friend happy."

Stacy Sims, who is working on a master's degree in social work, also writes of the sadness that envelops a family when a young son sees his father only during infrequent prison visits and hears him only during timed telephone calls. Her mother, Katie Sims, describes Mr. Sinclair as "a good person who caused no harm to this country," which may be a slight exaggeration, but the PSR's description of the drug deal for which Mr. Sinclair was convicted does, after all, portray Mr. Sinclair as a middleman, attempting to introduce a customer to one seller unsuccessfully, and then to another successfully, only to have the sale thwarted by undercover agents, who seized the seller's cocaine. By leading the undercover agents to a substantial seller of cocaine, Mr. Sinclair, albeit unwittingly, may have done more good for the country than harm, as Katie Sims suggests.

6

Antoinette Boland, whose domestic disputes with Mr. Sinclair remind one of Santayana's observation that "[i]It takes patience to appreciate domestic bliss; volatile spirits prefer unhappiness,"[3] and, more importantly for the purposes of this proceeding, resulted in convictions that added 5 of Mr. Sinclair's 8 criminal history points, writes "begging the court to be lenient. . . ." Mr. Sinclair is, she writes, "[a] wonderful father to my two . . . a positive role model in their lives . . . [who] stress[ed] to [them] the importance of getting an education and doing the right Thing." While their relations may not always have been placid, she writes that she admired Mr. Sinclair for all he tried to do for the two children. Their son, Matt, writes of the pain of separation from his father: "I see kids with their fathers at ball games, car races, etc. and I remember when I use[d] to have that."

***(2) the need for the sentence imposed to reflect the seriousness of the offense, to provide adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant and to provide the defendant with correctional treatment in the most effective manner.*** While re-entry after deportation is a felony, and its seriousness should not be unduly minimized, it occupies a fairly low place in the pantheon of federal crimes which this Court daily considers. A sentence of 92 months is not necessary for the purposes of deterring future unlawful entries by Mr. Sinclair into the United States. The potential harshness of the sentence that could be expected for future re-entries after deportation is a powerful discouragement to Mr. Sinclair's entering the United States unlawfully. The Court can further deter unlawful re-entry by imposing a special condition of supervised release requiring that he not re-enter or remain in the United States unlawfully.

Because Mr. Sinclair is an alien who will almost surely be deported after the service of

---

[3]George Santayana, <u>The Life of Reason</u>, "Reason in Society," ch. 2 (1905–6).

7

his sentence, there is little need to protect the public of the United States by isolating Mr. Sinclair in confinement. Indeed, the best protection for the public may be to protect the public fisc from the $1848.02 which the United States now pays each month to incarcerate Mr. Sinclair. "To tax and to please," as Edmund Burke said, "no more than to love and to be wise, is not given to men." Nevertheless, one has to question the wisdom of a system that requires that all of the federal taxes of a middle class family be used to keep Wayne Sinclair in jail, when he should be back in Jamaica.

*(3) the kinds of sentences available.* As noted below, certain recommendations that the trial court might well decide to make to the Bureau of Prisons in order to fashion an effective sentence will be unavailable in this case.

*(4)-(5) Consideration of the applicable Sentencing Guidelines and the Sentencing Commission's policy statements.* These consideration, of course, guided the Court's initial sentencing.

*(6) The need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct*. Section 3553(a)(6) provides that sentencing judges are to consider "the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." If both were sentenced in accordance with the sentencing guidelines, Mr. Sinclair would serve considerably more time than would a United States citizen who had committed similar misconduct. (While a United States citizen, of course, could not be convicted of re-entry after deportation, he could be found guilty of aiding and abetting or causing such an offense under 18 U.S.C. § 2.) Citizen defendants are eligible for the drug treatment program which may reduce their sentence by up to a year; they are eligible to be released to halfway houses roughly six

months before the end of incarceration. While the in-prison portion of the drug treatment program is available to aliens, that portion of the drug treatment program that allows for early supervised release into the community is not available to Mr. Sinclair, nor is release to a halfway house. In addition, because he is eligible for deportation, Mr. Sinclair will probably be housed throughout the course of his incarceration in a facility more secure than that in which a similarly situated United States citizen would be held. While the Court, relying on considerable appellate precedent, rejected this factor as a grounds for downward departure in its initial sentencing, the factor has gained added importance in light of the requirement of the sentencing guidelines that similarly situated defendants be treated similarly.

*(7) the need to provide restitution to any victims of the offense.* This factor is not applicable. See PSR ¶ 80.

## CONCLUSION

For the above-stated reasons, a sentence of less than 92 months is sufficient to accomplish the objectives of the sentencing statute and we urge the Court to re-sentence the defendant to a reduced term of incarceration.

Respectfully submitted,

JEREMIAH DONOVAN
123 Elm Street--Unit 400
P.O. Box 554
Old Saybrook, CT 06475
(860) 388-3750
FAX 388-3181
Juris no. 305346
Fed.bar.no. CT 03536

9

## CERTIFICATION OF SERVICE

This is to certify that the above and foregoing was mailed, postage prepaid, by first class mail, on August 4, 2005, to Mr. Steven Reynolds, Assistant United States Attorney, United States Attorney's Office, Federal Building and Courthouse, 915 Lafayette Boulevard, Bridgeport, CT 06604.

_____
JEREMIAH DONOVAN